IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2009

## STATE OF TENNESSEE v. GARY V. BULLARD

**Appeal from the Circuit Court for Rutherford County
No. F-58722     James K. Clayton, Jr., Judge**

---

**No. M2008-01148-CCA-R3-CD - Filed June 25, 2009**

---

The Defendant, Gary V. Bullard, was charged with one count of aggravated assault and one count of attempted aggravated rape. Following a jury trial, he was found guilty of both counts. In this direct appeal, he argues that (1) the State presented evidence sufficient to convict him of simple assault, but not aggravated assault; and (2) the State presented evidence insufficient to convict him of attempted aggravated rape. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Jerry E. Farmer, Murfreesboro, Tennessee, for the appellant, Gary V. Bullard.

Robert E. Cooper, Jr., Attorney General; Elizabeth B. Marney, Assistant Attorney General; William Whitesell, District Attorney General; and Trevor Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The victim, Teresa Yearick, moved to La Vergne early in 2006 after experiencing marital problems that resulted in separation from her husband. She testified that she began working at a local Wal-Mart and that in February 2006 she moved in with a roommate at 215 Barnett Street. Shortly thereafter, in March, and without the victim's consent, the Defendant moved into that residence and began a romantic relationship with the victim's roommate. The Defendant is the victim's brother.

The victim had experienced problems with the Defendant before, and upon his arrival she immediately felt that he "was trying to control [her] like he owned [her]." He helped her buy a cell phone and a car to replace those that she had lost in her separation. At some times, however, he insisted on buying her things without her consent. At one time she expressed to the Defendant her desire to purchase, using her Wal-Mart employee discount, a $100 television. She planned to pay for it in installments and take possession of it at a later time. The Defendant insisted that she use his credit card to immediately purchase the television. The victim declined. The Defendant bought the television on his own and brought it back to their residence.

On April 24, 2006, the Defendant was using the victim's car while the victim was at work. As they had planned, the Defendant picked the victim up from work at 10:00 p.m. On the ride back to their residence, the Defendant informed the victim that their roommate had attempted suicide by ingesting a large amount of Tylenol and other medication. The victim asked whether the Defendant had called 911. He replied that he had not. The victim called 911 immediately after reaching their residence. Their roommate was taken to the hospital and treated.

The victim stayed at the hospital with her roommate overnight. On the morning of April 25, 2006, she returned home to get some rest. As she lay on the floor watching television, she noticed the Defendant pacing in and out of the house while talking to his on-and-off girlfriend of about twenty years. The victim could tell he was angry about something and tried to stay out of his way.

After ending his telephone conversation, the Defendant asked the victim when she was going to pay him for the television he had bought. The victim replied that she did not have the money to pay him and had wanted to buy the television on an installment plan for that reason. He asked again. The victim again replied that she did not have the money. The Defendant said, "all right. Watch this." He went to the victim's bedroom, picked up the television, walked out the front door, and threw the television onto the porch.

The victim threatened to call the police. The Defendant then picked up a hammer, which the victim feared he would use to attack her. Instead, the Defendant walked outside and began hitting the victim's car with the hammer, damaging the windshield. He then walked back into the house and grabbed the victim's hair with one hand. He punched her face with his other hand and slammed her face into the wall. He then forced her to the ground and choked her so severely that she bled from her eyes.

The victim was able to crawl toward the bathroom. After she had pulled herself about halfway in, the Defendant grabbed her head again and beat it on the bathroom's linoleum floor. The victim then moved to sit on the edge of the bathtub, intending to wash her face with water. At trial, the victim described the subsequent events:

> [The Victim]: And I'm sitting there and [the Defendant] reaches up on the counter, and he pulls over a five gallon bucket of Arm & Hammer liquid detergent,

and he just starts pouring it over my head, pouring it in my eyes, trying to make me drink it. Then he says watch this, and he urinates on me from behind.

And at this point half my hair is already, you know, pulled out, torn. My head is hurting. And then the next thing I know he's naked, and he's in the shower, and he's demanding that I take my clothes off. Scared to death as I was, I mean, I was fighting for my life, so I took my clothes off, humiliated, disgusted. Your own brother? So I got all my clothes off, and I had my bra on, and I had liquid detergent all over me, and he yelled at me to shut the bathroom door.

And when he was yelling at me to get into the shower, I just heard this voice just saying, this is, you know, your time for safety. This is when you're going to go. I was afraid to turn the door because I didn't know if it was locked, and I didn't know if the front door was locked. So I was scared if I went to run and I couldn't get out the door, then I really wouldn't make it out of there alive, but I did.

The victim ran from the house and took refuge across the street at 222 Barnett Street. Two residents of that house, Mary Ellen Greer and Sophia Greer, also testified. On April 25, 2006, they were both sitting on their porch watching Sophia's two small children play in the front yard. At some point they saw a tall, white, heavy-set man with short hair come out of 215 Barnett Street and throw a television onto the ground. A "couple of minutes" later, he came back outside and used a hammer to damage the windows and doors of a car parked in front of the residence. Neither witness got a close look at the man's face.

About five minutes later, a woman ran out of 215 Barnett Street yelling for help. She wore only a bra and, according to Mary Ellen, had what appeared to be "laundry detergent dripping from her all over her body." She looked as though she had been beaten, and one side of her face was swollen. The two women let the victim into their house. Mary Ellen gave the victim a towel and went back outside to watch the children and ensure no one tried to enter the house. Sophia called 911 and stayed with the victim. The police arrived about ten minutes later. During that time, Mary Ellen did not see anyone enter or exit the victim's residence.

Bob Hayes, a Patrol Officer with the La Vergne Police Department, responded to the 911 call. When he and a partner arrived at 215 Barnett Street, they noticed the front door was open. They also noticed a television lying on the porch and a car with a damaged windshield. Officer Hayes called into the house. The Defendant came to the door wearing an unbuttoned shirt and a pair of underwear. His entire body was wet as though he had been sweating profusely or had failed to dry himself after a shower.

Officer Hayes asked the Defendant to exit the residence. He then handcuffed the Defendant for the officer's safety. Officer Hayes entered the residence and took photographs while his partner stood watch outside. He introduced into evidence photographs of a living room in total disarray, a cell phone in the bathroom toilet, and the bathroom floor, on which he found clumps of hair and some pools of blue liquid. He also found an empty container of Arm & Hammer laundry detergent.

Officer Hayes transported the Defendant to the Rutherford County Jail after the completion of evidence collection and witness interviews.

The victim was transported to Stonecrest Hospital and treated for her injuries. She was released that evening and found her cell phone in the toilet when she returned home. The victim introduced into evidence police photographs of her injuries. Some were taken at the hospital and others were taken one or two days later. They show substantial bruising to her face as well as abrasions and lacerations to her body. The victim testified that her injuries included two swollen and black eyes, a broken nose, and arms so bruised she could not touch them without feeling pain. One bruise on her arm remained until November of 2006. She also experienced apparently permanent damage to her eyes in the form of "brown splotches" in her field of vision. The State did not introduce a medical report. The victim was able to take one week off work but had to return thereafter in order to keep her job. She noted that her injuries were severe enough that, upon her return, some of her coworkers had to avert their eyes from her face.

The Defendant elected not to testify. He presented no evidence in his defense. He was convicted of one count of aggravated assault and one count of attempted aggravated rape. He now appeals.

**Analysis**

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

**I. Sufficiency of the Evidence of Aggravated Assault**

The Defendant first contends that the evidence was insufficient to convict him of aggravated assault. Tennessee Code Annotated section 39-13-101(a)(1) provides that a person commits assault who "[i]ntentionally, knowingly or recklessly causes bodily injury to another." A person commits aggravated assault who "intentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1).

The Defendant concedes that he committed assault but contends that he did not commit aggravated assault because he did not use or display a deadly weapon and did not cause serious bodily injury to the victim. We agree that he did not use or display a deadly weapon in assaulting the victim; although he did display a hammer in the victim's presence, she did not testify that he demonstrated an intent to use it against her.

In our view, however, the proof did show that the Defendant caused serious bodily injury. Tennessee Code Annotated section 39-11-106(2) provides that "'bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." "'Serious bodily injury' means bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(34).

The Defendant relies on State v. Barnes, 954 S.W.2d 760 (Tenn. Crim. App. 1997), for his contention that the victim in this case did not suffer serious bodily injury. In Barnes, this Court concluded that a victim who suffered a bite wound to his arm had not suffered protracted or obvious disfigurement, the only potentially applicable definition of "serious bodily injury." Id. at 766. The Defendant's reliance on this case is misplaced; the injuries the Defendant inflicted upon the victim are substantially different in kind and severity from those in Barnes.

Taken in the light most favorable to the State, the evidence in this case established that the victim suffered protracted loss or substantial impairment of a bodily organ. See Tenn. Code Ann. § 39-11-106(34)(E). Despite the absence of a medical report, the jury was entitled to credit the victim's testimony that her vision was and remains impaired as a result of the Defendant's attack. We also conclude that the reaction of the victim's coworkers upon her return to work evidences that she suffered protracted or obvious disfigurement. See Tenn. Code Ann. § 39-11-106(34)(D). This issue is without merit.

**II. Sufficiency of the Evidence of Attempted Aggravated Rape**

The Defendant next contends that the evidence was insufficient to convict him of attempted aggravated rape. The applicable portion of Tennessee Code Annotated section 39-13-502 provides that "(a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (2) The defendant

causes bodily injury to the victim."  "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required."  Tenn. Code Ann. § 39-13-501.

The Tennessee Code Annotated also provides that:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101.  The Defendant argues, and we agree, that only subdivision (a)(3) potentially applies to his conduct: there is no evidence that he either mistakenly believed himself to have committed aggravated rape under the circumstances or that he believed his conduct, without more, would result in the commission of aggravated rape.  See Tenn. Code Ann. §§ 39-12-101(a)(1), (a)(2).  The State was therefore required to prove that the Defendant's conduct constituted a substantial step toward the commission of aggravated rape and that he acted intending to commit aggravated rape.

### A. Substantial Step

In State v. Reeves, 916 S.W.2d 909 (Tenn. 1996), our supreme court interpreted the recently amended Tennessee Code Annotated 39-12-101.  The court concluded that the statute's requirement of a "substantial step" had abandoned Tennessee's previous criminal attempt law, which held that "mere preparation" to commit an act was insufficient to support a conviction for attempt to commit that act and that "the act itself" had to have begun.  Id. at 913.  The court thus held that a jury is entitled to find a "substantial step" toward the commission of an act even if the act itself had not begun.  Id. at 914.  The supreme court applied this rule in State v. Fowler, 3 S.W.3d 910 (Tenn. 1999), in which it held that a defendant had taken a "substantial step" toward committing statutory rape, and in combination with his culpable mental state had completed an attempted statutory rape, when he offered to pay an undercover police officer to deliver a young male for sex, regardless of

-6-

the fact that the defendant never actually took delivery of a young male in order to begin a sexual act. Id. at 912.

In this case, the Defendant had already weakened the victim by inflicting bodily injury upon her, and continued to do so contemporaneous with his removal of his own clothes and his demand that she remove hers. He then ordered her to join him in the shower. Applying the test described in Reeves and Fowler, we conclude that the Defendant took a "substantial step" toward the commission of aggravated rape.

### B. Intent to Commit Aggravated Rape

As noted, in order to have committed attempted aggravated rape the Defendant must have had a "specific intent" to commit aggravated rape in addition to taking a substantial step toward its commission. State v. Kimbrough, 924 S.W.2d 888, 890 (Tenn. 1996). Our supreme court has interpreted this requirement to mean that he must have had the unlawful penetration of the victim as his "conscious object or desire." State v. Mateyko, 53 S.W.3d 666, 669 (Tenn. 2001). We conclude that the evidence at trial, when taken in the light most favorable to the State, was such that any rational juror could have found that the Defendant harbored this intention.

In reaching this conclusion, we first note that the evidence supporting the Defendant's intent to rape the victim is entirely circumstantial; he did not announce or otherwise make explicit a desire to rape her. A defendant may be convicted using entirely circumstantial evidence, however. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973). "When a case is made by circumstantial evidence alone . . . the facts and circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

In arguing for his guilt, the State contends that the Defendant's act of urinating on the victim was "an initial degrading and sexually provocative act." While we agree that the Defendant intended to degrade and humiliate the victim in concert with his other conduct, we cannot conclude that urinating on the victim was by its nature a sexual act evidencing the Defendant's specific intent to unlawfully penetrate her thereafter.

The Defendant, for his part, unconvincingly argues that he merely extended an "invitation" for the victim to "join him" in the shower after a "lull in the proceedings" during which the victim formed a desire to wash herself off. We find no evidence of such a "lull," especially because the Defendant suggests it occurred before he poured laundry detergent onto the victim. The Defendant also claims that the victim was "free to leave" after he stepped into the shower. We must conclude that the Defendant's demands that the victim disrobe, close the bathroom door, and join him in the shower are facts that discredit his argument.

The evidence therefore establishes that the Defendant, after beating and humiliating the victim, removed all of his clothes and stood in the bathtub. He then ordered that she remove her clothes, conceal the two of them inside the bathroom by closing the door, and join him in the shower.

Although there is no evidence that the Defendant was in a state of arousal or "semi-arousal," see State v. Thomas Coburn, No. E2005-02730-CCA-R3-CD, 2007 WL 2284814, at *12 (Tenn. Crim. App., Knoxville, Oct. 6, 2008), the Defendant's own nakedness strongly discounts the possibility that he simply intended to further assault or sexually batter the victim. Although the evidence of the Defendant's specific intent is not overwhelming, we conclude under these circumstances that any rational jury could have excluded "any other reasonable hypothesis" and found beyond a reasonable doubt that the Defendant intended to rape the victim. See Crawford, 470 S.W.2d at 612.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions.

_____
DAVID H. WELLES, JUDGE